IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PATRICK J. BERGIN,                    )
                                      )
                    Plaintiff,        )        Civil No. 06-6311-HO
                                      )
          v.                          )        ORDER
                                      )
SUSAN MCCALL, et al.,                 )
                                      )
                    Defendants.       )

     Plaintiff brings this action alleging violation of his civil
rights in violation of 42 U.S.C. § 1983.  Plaintiff alleges that
defendants conspired to: coerce plaintiff to be evaluated for
substance abuse; force plaintiff to participate in a drug
rehabilitation facility that uses religious indoctrination; force
plaintiff to profess belief in religious dogma; and to revoke his
license to practice medicine.  Plaintiff asserts that defendant
Norman Reynolds, in a conspiracy with the other defendants, falsely
diagnosed plaintiff with substance abuse and that defendants
conspired to confine plaintiff in a religiously based facility and

to contrive allegations resulting in plaintiff's loss of his medical license.

There are several motions before the court.

A.  Plaintiff's Motion to Allow Filing of a Second Amended Complaint (#32)

Although plaintiff moved to amend after a motion to dismiss had been filed, the motion is allowed and the court will construe the pending motion to dismiss as against the Second Amended Complaint.


B.  Defendant Norman Reynolds' Motion to Dismiss (#21)

Defendant Dr. Norman Reynolds moves to dismiss, asserting that plaintiff fails to raise any allegations against him within the two year statute of limitations and that he is entitled to absolute immunity.

Plaintiff alleges that in September and October of 2002, defendant Dr. Richard Romm, plaintiff's former cardiology practice partner, discussed with Oregon Health Professionals' Director, defendant Susan McCall, concerns that plaintiff used controlled substances recreationally.  Plaintiff alleges that in November of 2002, defendant McCall conspired with defendant Reynolds to have Reynolds perform an evaluation of plaintiff.  Plaintiff asserts that McCall and Reynolds predetermined the outcome of the

evaluation, performed on November 11 and 12 of 2002, and designed it to place plaintiff into a program of religious indoctrination.

Plaintiff alleges that defendant Reynolds completed his evaluation on November 27, 2002, and recommended plaintiff for rehabilitation in a religious facility. The complaint relates that plaintiff's refusal to comply with religious indoctrination resulted in suspension of his license in January of 2003. Plaintiff's license was restored on the condition that he abstain from consumption of alcohol and submit to random testing. However, plaintiff alleges that upon testing positive for alcohol, he was again forced to participate in religious counseling or lose his license.  On March 7, 2005, plaintiff's license was again suspended. Plaintiff's Second Amended Complaint adds that Reynolds communicated with other defendants "in a continued, malicious and conspiratorial effort to affirm a mandate that plaintiff Bergin be evaluated and/or treated by religiously based facilities" during the period from June 2004 to March 2005.

Oregon's two-year statute of limitations for personal injury actions applies to actions under 42 U.S.C. § 1983. <u>Cooper v. City of Ashland</u>, 871 F.2d 104, 105 (9th Cir. 1989). Plaintiff filed the initial complaint in this case on December 7, 2006. In an effort to avoid the limitations period, plaintiff asserts that defendant Reynolds' acts and omissions occurred from November 2002 until

3 - ORDER

March 2005. Plaintiff also asserts that his cause of action did not accrue until his second license suspension in March 2005.

However, it is clear from plaintiff's complaint that he knew he sustained his alleged injury of violation of his religious and other rights guaranteed by the First and Fourteenth Amendments earlier. Plaintiff alleges that he stated a willingness to enter a rehabilitation facility, if it was not religious based, on June 30, 2004. Proposed Second Amended Complaint (attached to #32 at ¶ 28). Plaintiff alleges concrete injury in the complaint beginning as early as 2003.

Plaintiff concedes that the First Amended Complaint does not specifically describe post 2002 activity by defendant Reynolds and plaintiff only adds conclusory conspiracy allegations regarding affirming that 2002 activity in the Second Amended Complaint.

The accrual of civil conspiracies for limitations purposes is determined in accordance with the last overt act doctrine. Venegas v. Wagner, 704 F.2d 1144, 1146 (9th Cir. 1983). Under the doctrine, "[i]njury and damage in a civil conspiracy action flow from the overt acts, not from 'the mere continuance of a conspiracy." Kadar Corp. v. Milbury, 549 F.2d 230, 234 (1st Cir. 1977) (quoting Hoffman v. Halden, 268 F.2d 280, 303 (9th Cir. 1959). Thus, the cause of action runs separately from each overt act that is alleged to cause damage to the plaintiff, Lawrence v. Acree, 665 F.2d 1319, 1324 (D.C.Cir. 1981), and "[s]eparate conspiracies may not be

4 - ORDER

characterized as a single grand conspiracy for procedural advantage." <u>Fitzgerald v. Seamans</u>, 553 F.2d 220, 230 (D.C.Cir. 1977).

The last alleged overt act by Reynolds occurred in 2002. The alleged later "effort to affirm" that act does not bring the act within the limitations period. See <u>Columbia Steel Casting Co., Inc. v. Portland General Elec. Co.</u>, 111 F.3d 1427, 1444-45 (9th Cir. 1996). (mere reaffirmation is not an overt act sufficient to restart the statute of limitations). To establish a continuing violation, continued unlawful acts must be demonstrated. <u>Ward v. Caulk</u>, 650 F.2d 1144, 1147 (9th Cir. 1981). It is the wrongful act, not the conspiracy, which is actionable in a civil case. The existence of a conspiracy does not generally postpone accrual of causes of action arising from the conspirators' separate wrongs. <u>See</u> <u>Compton v. Ide</u>, 732 F.2d 1429, 1433 (9th Cir. 1984). Plaintiff's Second Amended Complaint makes clear that defendant Reynolds did not take any further affirmative steps such that plaintiff can avoid the statute of limitations. In addition, the court agrees, for the reasons stated in defendant Reynolds' briefing, that the complaint against Reynolds should be dismissed on witness, quasi judicial and medical consultant immunity grounds. Accordingly, defendant Reynolds' motion to dismiss is granted with prejudice.

C.   Stipulated Motion to Dismiss (#29)

The parties stipulate to the dismissal of defendant Richard Romm.   The motion to dismiss defendant Romm is granted with prejudice.


D.   State Defendants' Motion for Summary Judgment (#58) and Defendant Norman Reynolds' Motion for Joinder (#62)

The state defendants seek summary judgment.   Defendant Reynolds moves to join the summary judgment motion.   As noted above, the private individual defendants, defendants Romm and Reynolds, have been dismissed from this case.   Accordingly, defendant Reynolds' motion to join is denied as moot.

The State defendants assert that: (1) many of plaintiff's section 1983 claims fall outside the applicable statute of limitation; (2) plaintiff's claims are barred by issue and claim preclusion; (3) plaintiff's due process claims are precluded by plaintiff's failure to appeal the Oregon Board of Medical Examiner's final order to the Oregon Court of Appeals; (4) they are entitled to absolute judicial immunity; (5) the court lacks jurisdiction pursuant to the Younger abstention doctrine; (6) plaintiff's claims are barred under the Rooker-Feldman doctrine; (7) the court lacks jurisdiction under the Eleventh Amendment; and

(8) plaintiff was not denied equal protection preventing a 42 U.S.C § 1985(3) conspiracy claim.

Plaintiff does not appear to be pursuing a section 1985 claim nor could he because he has not alleged racial or otherwise class-based "invidious discriminatory animus" for the conspiracy. See Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 268-69 (1993).

While plaintiff has named the Board members individually, the complaint makes clear he is suing them in their official capacity. See, e.g., Second Amended Complaint at ¶ 16 (McCall acting in her official capacity as Director of the Oregon Health Professionals Program); ¶ 21 (individual members of the Oregon Board of Medical Examiners acting in their official capacity). Consequently, to the extent plaintiff seeks relief that is not in the form of prospective injunctive relief, his claims are barred under the Eleventh Amendment.

The state agencies and members of those agencies are immune under the Eleventh Amendment. See Shaw v. California Dept. of Alcoholic Beverage Control, 788 F.2d 600, 603 (9th Cir. 1986) (a suit against a state agency is considered to be a suit against the state, and thus is barred by the Eleventh Amendment). "When suit is commenced against State officials, even if they are named and served as individuals, the State itself will have a continuing interest in the litigation whenever State policies or procedures

are at stake." <u>Idaho v. Coeur d'Alene Tribe of Idaho</u>, 521 U.S. 261, 269 (1997).

Plaintiff may avoid the Eleventh Amendment under the <u>Ex Parte Young</u> doctrine.   <u>See</u> <u>Pennhurst State School and Hospital v. Halderman</u>, 465 U.S. 89, 102 (1984).   However, under this exception, a plaintiff may only seek prospective injunctive relief that governs the official's future conduct.   The court may not award retroactive relief that requires the payment of funds from the State treasury.   <u>Id.</u> at 102-03.   The Supreme Court has cautioned against permitting federal court action in every case where prospective injunctive relief is sought against officers named in their individual capacities.   The Supreme Court instructs that application of the <u>Ex parte Young</u> doctrine must reflect a proper understanding of its role in the federal system and respect for State courts instead of a reflexive reliance on an obvious fiction. <u>Coeur d'Alene Tribe of Idaho</u>, 521 U.S. at 270.   Accordingly, the Eleventh Amendment serves to bar at least plaintiff's claims seeking a declaration regarding past actions and seeking monetary damages for that past action.

In addition, the Oregon Board of Medical Examiners has immunity from suit and the individuals also enjoy immunity because they are not empowered to act alone.   <u>See</u> ORS § 677.335(1). However, this does not make an <u>Ex parte Young</u> action inappropriate. The Court has permitted actions against individual officials to go

8 - ORDER

forward even though an action could not be brought against the state agency by whom the officials are employed. See, e.g., Alabama v. Pugh, 438 U.S. 781 (1978). Nonetheless, plaintiff may only go forward with prospective relief against the Commissioners to enjoin them from taking action that allegedly continues to violate federal law.

However, plaintiff also runs into the obstacle of issue and claim preclusion. After a hearing on November 3, 4, and 5 of 2004, before the Board of Medical Examiners, the following factual findings were made:

> 1. Patrick John Bergin, MD, is a licensed physician in the state of Oregon. He is a cardiologist, and a member of the Oregon Cardiology P.C. practice group in Eugene, Oregon.
>
> 2. In the spring of 2002, Dr. Bergin separated from his wife after 26 years of marriage. In the summer of 2002, Dr. Bergin began dating and socializing with a new group of friends.  He had dinner and attended parties with these friends. He hosted "tailgate" parties in connection with University of Oregon football games. (Tr. 1 at 267. 69) He would also occasionally go to Adam's Place, a drinking establishment, to meet fiends and drink martinis (Tr. 1 at 254.)
>
> 3. Dr. Bergin used cocaine in August 2002. He attended parties where cocaine was available and offered and, on a couple of occasions, decided to partake of it. (Tr. 1 at 254-55.)
>
> 4. At some point prior to October 19, 2002, one of Dr. Bergin's medical partners, Dr. Romm, received a report that Dr. Bergin was keeping late night hours and using cocaine. Dr. Bergin's partners took this report seriously and contacted Dr. Susan McCall, the Medical Director of the Oregon Diversion Program for health professionals. The partnership hoped that they could avoid Board

involvement by contacting the diversion program. Based on
this conversation with Dr. McCall, the partners invited
her to participate in an intervention meeting they
planned to have with Dr. Bergin on October 21, 2002. (Tr.
2 at 31-32; 50-52)

5. On Saturday, October 19, 2002, Dr. Bergin rented a
recreational vehicle (RV) and hosted a cookout and
tailgate party before the University of Oregon football
game. The game began at 12:30 p.m. Dr. Bergin consumed a
few beers at the party before the game, and may have had
another beer when he returned to the rented RV. After
that, Dr. Bergin returned to his home with his friend and
co-worker, Dr. Joe Chambers. The two had dinner, and Dr.
Chambers left Dr. Bergin's around 9 p.m. About an hour
later, Dr. Bergin went to the bar at Adam's Place. While
there, he ate some chicken and drank martinis. (Tr. 1 at
246-52.)

6. Dr. Bergin left Adam's Place shortly before midnight.
On his way home, he was stopped by a Eugene police
officer for speeding and failing to maintain a lane. Upon
contact with Dr. Bergin, the officer detected the odor of
alcoholic beverage and observed other indicia of
intoxication. Just after midnight on October 20, 2002,
the officer arrested Dr. Bergin for driving under the
influence of intoxicants (DUII) in violation of ORS
813.010. Dr. Bergin told the officer that he had had "a
couple" martinis at Adam's Place. Following the arrest,
Dr. Bergin submitted to a breath test on an Intoxilyzer
5000, which disclosed a .13 blood alcohol content. (Ex
A11.)

7. The next day, Monday, October 21, 2002, Dr. McCall and
three of Dr. Bergin's partners, Drs. Romm, Chappell, and
Hahn, confronted Dr. Bergin about his alleged cocaine
use. [footnote omitted] They also expressed concern about
his drinking and keeping late hours. Dr Bergin's partners
were aware that he was under a lot of stress as a result
of his impending divorce. They perceived him to be in a
"crisis" at that point. They also believed he was
"burning the candle at both ends," trying to manage his
medical practice while dealing with his separation,
impending divorce and child care issues. (Tr. 2 at
33-49).

8. During the October 21, 2002, meeting, Dr. Bergin
denied using cocaine.  He acknowledged, however, that he

was under a lot of stress and that he drank too much at times. As a result of this intervention, Dr Bergin signed an agreement with the Oregon Health Professionals Program (HPP) and agreed to undergo an in-patient evaluation at the Betty Ford Center in California (Tr 1 at257-58; Tr. 2 at 50-52; Exs A7 and A10 at 28).

9. At Dr. McCall's behest, Dr. Bergin participated in a telephone intake interview with the Betty Ford Center prior to entering the center. During the intake interview, Dr. Bergin admitted to recent cocaine use. Dr. McCall overheard this admission. Dr. Bergin later refused to attend an in-patient evaluation at the Betty Ford Center, [footnote omitted] and Dr. McCall threatened to report him to the Board. She advised that the Board would require him to attend an in-patient evaluation. (Ex. A10 at 29).

10. Dr Bergin subsequently agreed to undergo an out-patient evaluation with someone who was not affiliated with the Betty Ford Center (Tr 1 at 261 ). On November 11 and 12, 2002, Dr. Bergin underwent a "comprehensive fitness-for-duty evaluation" by Norman T. Reynolds, MD, a psychiatrist based in San Jose, California. Dr. Reynolds interviewed Dr. Bergin for more than 10 hours. He also administered psychological tests, reviewed Dr. Bergin's medical and police reports, and conducted collateral interviews regarding Dr. Bergin with Dr. McCall, Dr. Chappell and Dr. Michael D. Webb, a psychiatrist who Dr. Bergin saw in 1999. (Ex. A10; tr. 1 at 168-170).

11. Dr. Reynolds determined that Dr. Bergin was not a reliable historian. He believed that Dr. Bergin provided distorted information by means of significant omissions, concealment and denial. Dr. Reynolds determined that, despite Dr. Bergin's belief that he could control his alcohol use, Dr. Bergin had a problem with alcohol abuse and possible dependence. And, although Dr. Bergin denied ever using cocaine, Dr. Reynolds believed (based on information from Dr. McCall) that Dr. Bergin had recent problems with cocaine and marijuana use. Dr. Reynolds found "many red flags that indicate impairment." He reported that Dr. Bergin was exhibiting problems in several areas of his life: medical stress-related symptoms, deterioration of marriage, quickly finding a new committed relationship, social life activities, and legal problems with the DUII . Dr. Reynolds diagnosed Dr.

11 - ORDER

Bergin with an alcohol abuse disorder, possible substance abuse disorder, an adjustment disorder and psychological factors affecting physical condition. (Ex. A10; tr. 1 at 172-74).

12. In a detailed report issued November 27, 2002, Dr. Reynolds concluded that Dr. Bergin was not fit for duty. He strongly recommended that Dr. Bergin be admitted to a residential treatment program to address substance abuse and psychiatric and behavioral problems. Dr. Reynolds also recommended that the treatment and recovery program "include 12-Step programs." (Ex. A10).

13. After Dr. Reynolds' evaluation and report, Dr. Bergin agreed to attend an in-patient evaluation and treatment program at Sierra Tucson in Arizona. Dr. Bergin chose Sierra Tucson over other programs because it required a 30-day stay, whereas other programs required longer stays. Dr. Bergin realized that his continued practice of medicine was dependent upon his participation in a treatment and recovery program, and he agreed to go after the Christmas holiday. (Tr. 2 at 64-66).

14. By letter dated January 8, 2003, the Board advised Dr. Bergin that it had opened an investigation on his practice status, his recent DUII arrest, and his fitness-to practice evaluation. Dr Bergin signed an Interim Stipulated Order, in which he agreed to temporarily withdraw from the practice of medicine pending the outcome of the Board's investigation (Ex. R2).

15. On January 16, 2003, Dr. Bergin was admitted to Sierra Tucson. During the initial psychiatric interview with Joe W. King, MD, Dr. Bergin reported that he had been "partying [his] ass off' since his marital separation in May 2002. Dr. King, who diagnosed Dr. Bergin with polysubstance abuse, currently related to alcohol and cocaine, found Dr Bergin to be quite defensive during the interview. He reported: [A]lthough [Dr. Bergin] is giving lip service to having accepted the significance of his alcohol and cocaine abuse, he still uses rationalization, justification, minimization and some projection in describing the events of the past several months." Dr. King also noted that although Dr. Bergin described himself as an agnostic who was raised as a Catholic, he did not identify any spiritual block to accepting a 12-Step program. (Ex. A9).

16. Dr. Bergin was discharged from Sierra Tucson on February 15, 2003. Evaluators at the treatment program deemed him fit to return to the practice of medicine. (Ex. A9.) Following his discharge, Dr. Bergin agreed to participate in a diversion program under the auspices of HPP. (Ex. R8).

17. On March 6, 2003. Dr. Bergin entered into a Stipulated Order with the Board. In that stipulation, Dr. Bergin conceded that he had violated ORS 677.190(7), which prohibits the habitual or excessive use of intoxicants, drugs or controlled substances. The Board terminated its interim order and reinstated Dr Bergin's license under certain terms of probation. Among other things, Dr. Bergin stipulated that he would participate in, and maintain compliance with, the recommendations of a HPP recovery program. He also stipulated that he "shall not possess and shall completely abstain from using ethanol and any mood altering or potentially addictive substances, including controlled substances " (Ex. A4).

18. For the next year, as part of his participation in the HPP program, Dr Bergin was subjected to random urine testing. These tests were negative for ethanol and controlled substances (Ex. A25).

19. On Mach 11, 2004, Dr. Bergin was asked to provide a urine sample. He had last been tested about a month before, on February 6, 2004. The March 11, 2004, sample was negative for ethyl alcohol and controlled substances, but showed an unacceptably low creatinine level. The "acceptable range" for creatinine is between 20 and 400 mg/dL, and Dr. Bergin's urine test disclosed a level of 12.5 mg/dL. [footnote omitted] A creatinine level of less than 20 mg/dL is evidence of dilution in the urine. The 12.5 creatinine level indicated that Dr Bergin had consumed a substantial amount of fluid, probably a gallon or more, in the hours before he provided the sample at 4:55 p.m. on March 11th. (Ex. A25; tr. 3 at 58-60, 75, 151-52).

20. Dr. Bergin was next called to provide a urine sample on March 24, 2004. Because of the unacceptable creatinine level in his previous sample, HPP sent Dr. Bergin's sample taken on March 24, 2004, to National Medical Services, Inc., a laboratory in Pennsylvania. National Medical Services tested the sample specifically

for the alcohol metabolite, ethyl glucuronide (EtG). [footnote omitted] (Ex. A20.) Dr. Bergin was unaware that HPP intended to have his urine tested for the presence of EtG. (Tr. 3 at 164).

21. National Medical Services tested two aliquots of Dr. Bergin's urine sample. Both were positive for EtG. The first urine screen showed 2639 nanograms per milliliter (ng/mL) EtG, which prompted the second test. The second EtG confirmation test showed 3131 ng/mL [footnote omitted] (Ex. A20, tr. 1 at 37-41).

22. Following the positive EtG testing at National Medical Services, Dr. Bergin's March 24,2004, urine sample was sent to Northwest Toxicology Laboratory in Utah. Northwest Toxicology also ran a screen and confirmation test on the sample, both of which came back positive for EtG. The first test showed 4141 ng/mL, and the second showed 2886 ng/mL. [footnote omitted] (Ex. A21; tr at 97-98).

23. When Dr. Bergin was advised of the positive EtG test results, he denied consuming any alcoholic beverages and was adamant that the laboratory testing showed a false positive. (Ex. A6.) Because Dr. Bergin refused to accept the verified toxicology results and refused to acknowledge having a substance use disorder, Dr. McCall terminated him from HPP for non-compliance. Dr. McCall then referred the matter to the Board for further investigation. (Ex. A5.) By letter dated April 19, 2004, the Board notified Dr. Bergin that it had received a complaint regarding his compliance with the Stipulated Order. (Ex. R9.)

24. As part of its investigation, the Board requested that Dr. Bergin undergo another independent, multi-disciplinary evaluation and continue with random substance abuse monitoring. Dr. Bergin refused to sign the Board's proffered Interim Stipulated Order (Ex. A12).

25. On June 3, 2004, the Board issued an Order for Evaluation, in which it ordered Dr. Bergin to undergo an in-patient multi-disciplinary evaluation to assess his physical and mental capacity to safely and competently practice medicine in Oregon. The Order also required that the evaluation be done at a health care facility pre-approved by the Board's Medical Director and that Dr.

14 - ORDER

Bergin enroll in and begin the evaluation within 30 days from the date of the Order (Exs. A2, R11).

26. Dr. Bergin did not begin any in-patient assessment program at a Board approved facility within 30 days of the Order for Evaluation. He did, however, undergo a diagnostic assessment by Alan Marlatt, PhD, the Director of the Addictive Behaviors Research Center at the University of Washington in Seattle Ex. R13). Dr. Bergin also commissioned Stanton Peele, PhD, an addiction, psychology and legal expert in New Jersey, to review his case record and determine whether he had an alcohol or substance abuse problem in the fall of 2002. (Ex. R15.) Neither of these evaluators were approved by the Board or its Medical Director.

27. Dr. Marlatt interviewed Dr. Bergin for two hours on June 22, 2004, reviewed his prior assessment records, and had him complete a Comprehensive Drinker Profile. Dr. Marlatt considered Dr. Bergin to be cooperative and a reliable historian. Dr. Marlatt concluded that, notwithstanding Dr. Bergin's 2002 DUII arrest and occasional cocaine use, Dr. Bergin did not meet the diagnostic criteria of abuse or dependence (Ex. R13; tr. 1 at 128-45.)

28. Dr. Peele reviewed Dr. Bergin's assessment and evaluation records and determined that Dr. Bergin did not meet the DSM-IV-TR criteria for alcohol or drug abuse or dependence. Dr. Peele questioned Dr. Reynolds' diagnosis and conclusions and the evaluations of Dr. Bergin from Sierra Tucson. Dr. Peele also identified potential legal issues if the Board required that Dr. Bergin undergo an evaluation at a treatment facility that employs a "12-Step" approach. [footnote omitted] (Ex. R15).

29. By letter to the Board dated June 30, 2004, Dr. Bergin's attorney responded to the Order for Evaluation. The letter opened, "My client Dr. Patrick Bergin, wishes to respond to the Order for Evaluation signed by Dr Spokas and issued June 3, 2004, in a cooperative and complete manner." The letter asserted that Dr. Bergin had complied with the Order for Evaluation in substance by virtue of the Dr. Marlatt evaluation. The letter also stated an objection to participating in any in-patient evaluation conducted at any institution that employed a "12 Step" treatment model. In addition, Dr. Bergin's attorney maintained that Dr. Bergin never exhibited

evidence of impairment or dysfunction and therefore the prior mandated evaluations and recommendations were inappropriate and erroneous. (Ex. R12.)

30. The Board determined that Dr. Bergin did not comply with the Order for Evaluation in a timely fashion. Thereafter, on July 30, 2004, it issued a Complaint and Notice of Proposed Disciplinary Action to Dr. Bergin. The Complaint alleged that Dr. Bergin consumed alcohol in violation of the March 6, 2003, Stipulated Order. The Complaint further alleged that Dr. Bergin did not comply with the Order for Evaluation because the health care professionals he consulted were not presented to the Board for approval and did not meet the standard of a multi-disciplinary evaluation center. (Ex. Al).

31. EtG is a urinary marker for alcohol use. Testing for the presence of EtG in urine has been widely used in Europe since 1999 as evidence of alcohol consumption. (Tr. 1 at 46-48.) The marker, and the testing for it, are now gaining use and acceptance in the United States. (A19 at 1.) National Medical Services has been performing EtG testing for two years. (Tr. 1 at 62.) Northwest Toxicology began its EtG testing program in March 2004. (TI. 1 at 105.) Now that an assay for EtG is commercially available in this country, an increasing number of abstinence programs rely on the testing as a way to determine whether participants are abstaining from alcohol use. (TI. 1 at 108-09).

32. Only .02-.04 percent of ethyl alcohol ingested is metabolized to EtG. The metabolite is not detectable unless alcohol has been consumed because such a small fraction of consumed alcohol is metabolized to EtG, a significant amount of alcohol must be consumed for EtG to be detected in urine (Ex. A19 at 1-3).

33. Although it is generally accepted in the scientific community that ethyl alcohol is the only source for the production of EtG, the studies have yet to establish any clear correlation between EtG levels in the urine and the amount of alcohol consumed and/or the time of consumption. (Tr. 1 at 75, 107-08; tr. 3 at 8-12). Consequently, while the presence of EtG in the urine demonstrates that the test subject consumed ethyl alcohol, the testing does not show when the alcohol was consumed, how much was consumed or whether the person was

intoxicated as a result of the consumption [footnote 9 omitted] (Tr. 3 at 13-14).

34. Dr. Michael Feldman, PhD, who has a doctorate in drug metabolism and a post-doctorate degrees in analytical toxicology, is the General Manager of Northwest Toxicology Laboratory. (TI. 1 at 79-80). Northwest Toxicology has conducted in-house studies to determine what kind of EtG levels could be detected after incidental contact with ethanol. The laboratory's studies included the test subjects' use of Nyquil, Listerine, O'Doul's non-alcoholic beer, cooking wine, Purel hand cleaner (which is 62 percent ethanol), and communion wine. The results consistently showed EtG levels of less than 250 ng/mL from any of these exposures. The laboratory's policy, developed through its testing and consultation with experts, is that if the EtG level is above 500 nanograms, incidental alcohol exposure is extremely unlikely. (Tr. 1 at 92-97, 100.) In Dr. Feldman's opinion, a urine EtG level in excess of 2500 nanograms is indicative of beverage alcohol consumption. (Tr. 1 at 95-97).

35. Dr. Edward Barbieri has a PhD in pharmacology and is a forensic toxicologist at National Medical Services laboratory. (Tr. 1 at 21-22). Like Northwest Toxicology, National Medical Services has conducted small-scale studies regarding incidental contact with ethanol. All the tests showed EtG levels below 250 nanograms, except for one, A very petite pregnant woman, who repeatedly rinsed with mouthwash over the course of a day, had a level of 310 nanograms per milliliter from this exposure (Tr. 1 at 61-64). In Dr. Barbieri's opinion, an EtG level of 2600 to 3100 nanograms indicates that the person consumed an alcoholic beverage. (Tr. 1 at 50-51).

36. Dr. Robert Pandina, PhD, is the director for the Center of Alcohol Studies at Rutgers University. By training, he is a developmental neuropsychologist and psychopharmacologist. (Tr. 3 at 4.) In his opinion, the "most likely source" for a positive EtG reading of 2500 to 4400 ng/mL is the voluntary consumption of beverage alcohol. Dr. Pandina noted, however, that this level is "not so extreme" so as to completely rule out the possibility of exposure to other substances. (TI. 3 at 19.)

Final Order of Board of Medical Examiners at pp. 2-9 dated February 3, 2005 (attached to Memo in support of Summary Judgment (#59)).

The Board concluded that plaintiff willfully violated ORS § 677.190(18), engaged in unprofessional or dishonorable conduct in violation of ORS §§ 677.190(1); ORS 677.188(4)(a), but did not engage in habitual or excessive use of intoxicants during March 2004. The Order stated sanctions are warranted for willfully violating a Board order. Dr. Bergin raised many of the arguments he raises in his current complaint before the Board, including his objection to religious programs.[1] The Board granted plaintiff a contested case hearing where he was represented by counsel and had the ability to present evidence and witnesses and to cross-examine adverse witnesses. The Board also provided the opportunity to appeal pursuant to ORS § 183.482. Plaintiff chose not to appeal.

A federal court must give the same preclusive effect to a state court judgment as would be given that judgment under the law of the state in which the judgment was rendered. <u>Migra v. Warren City School Dist. Bd. of Educ.</u> 104 S. Ct. 892, 896, 465 U.S. 75, 81 (1984). The well established rule in Oregon is

> that a plaintiff who has prosecuted one action against a defendant through to a final judgment binding on the parties is barred on *res judicata* grounds from prosecuting another action against the same defendant where the claim in the second action is one which is based on the same factual transaction that was at issue in the first, seeks

---

[1] The Board did not require participation in a 12-step program. Final Order at p. 18.

a remedy additional or alternative to the one sought
earlier, and is of such a nature as could have been joined
in the first action.

Rennie v Freeway Transport, 294 Or 319, 656 P.2d 919, 921 (1982).

Oregon Courts have established that preclusive effect may be
given to the essential findings of administrative agencies, if the
parties had a full and fair opportunity and incentive to be heard and
the decision was subject to judicial review. Stanich v. Precision
Body and Paint, Inc., 151 Or. App. 446, 455 (1997). Plaintiff could
have brought his constitutional claims before the Oregon Court of
Appeals and had every incentive to do so. See ORS § 183.482(8)(b)(C)
(the court shall remand to the agency if it finds that the agency's
exercise of discretion was in violation of a constitutional or
statutory provision). Plaintiff would be barred in state court from
bringing those claims now. Accordingly, plaintiff is precluded from
seeking relief for violation of his constitutional rights in this
court based on the same factual transaction raised in previous state
court proceedings. Therefore, summary judgment is appropriate.


E.   Plaintiff's motions for Preliminary Injunction (#17) and for a
Temporary Restraining Order (#76)

Plaintiff's request for a temporary restraining order and
preliminary injunction are denied as moot.


19 - ORDER

CONCLUSION

For the reasons stated above, plaintiff's motion for leave to file a second amended complaint (#32) is granted, defendant Romm's stipulated motion to dismiss (#29) is granted, defendant Reynolds' motion to dismiss (#21) is granted, the state defendants' motion for summary judgment (#58) is granted, defendant Reynolds' motion to join (#62) is denied as moot, and plaintiff's motions for preliminary injunction (#17) and for a temporary restraining order (#76) are denied as moot and this action is dismissed.

DATED this __15th__ day of August, 2007.

                            __s/ Michael R. Hogan__
                            United States District Judge

20 - ORDER